KHAI LEQUANG (SBN 202922)
klequang@orrick.com
AARON M. RUBIN (SBN 320880)
amrubin@orrick.com
RICHARD W. KREBS (SBN 278701)
rkrebs@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street
Suite 1100
Irvine, CA 92614-8255
Telephone: +1 949 567 6700
Facsimile: +1 949 567 6710

Attorneys for Plaintiffs
CREDIT SUISSE LENDING TRUST (USA),
CREDIT SUISSE LENDING TRUST (USA) 5, and
PRIMARY MASTERBAREAF PTC LIMITED, on
behalf of and as trustee of the CSSEL GUERNSEY
BARE TRUST

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CREDIT SUISSE LENDING TRUST (USA), CREDIT SUISSE LENDING TRUST (USA) 5, and PRIMARY MASTERBAREAF PTC LIMITED, on behalf of and as trustee of the CSSEL GUERNSEY BARE TRUST <br><br> Plaintiffs, <br><br> v. <br><br> TRANSAMERICA LIFE INSURANCE COMPANY, <br><br> Defendant. | Case No. 2:20-cv-02516-CAS(GJSx) <br><br> **FIRST AMENDED COMPLAINT FOR:** <br><br> **1. BREACH OF CONTRACT;** <br><br> **2. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (CONTRACTUAL);** <br><br> **3. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (TORTIOUS);** <br><br> **4. CONVERSION; AND** <br><br> **5. DECLARATORY RELIEF** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Credit Suisse Lending Trust (USA); Credit Suisse Lending Trust (USA) 5; and Primary MasterBareAF PTC Limited, on behalf of and as trustee of the CSSEL Guernsey Bare Trust (collectively, "Plaintiffs") file this Complaint against Defendant Transamerica Life Insurance Company ("Transamerica" or "Defendant"), and allege as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) and (3) because (a) the action is between plaintiffs that are citizens of Delaware, New York, and Guernsey (as described fully below) and a defendant that is a citizen of Iowa; and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      This Court has personal jurisdiction over Transamerica because Transamerica regularly conducts and transacts business in this state, including having issued some of the life insurance policies at issue in this state.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1), (a)(2), and 1391(b) because Transamerica conducts business in the Central District of California, and a substantial part of the events giving rise to the claims occurred in this judicial district, including Transamerica's issuance of a policy at issue in this Complaint.

## NATURE OF THE ACTION

4.      Plaintiffs bring this action seeking compensatory and punitive damages, equitable relief, and attorneys' fees based on Transamerica's unlawful increasing of the Monthly Deduction Rates on certain of its in-force universal life insurance policies (the "Policies").  By raising the Monthly Deduction Rates on the Policies, in some cases as much as 74%, without a proper basis, Transamerica has breached the express and implied terms of the Policies.

5.     The Policies are universal life insurance policies.  Broadly speaking, life insurance falls into one of two generic categories: (a) term life insurance and (b) cash value life insurance.

6.     Term life insurance provides protection for a limited number of years. The insurer pays the death benefit to the policyholder if the insured dies during the stipulated term (such as 10 or 20 years).  If the insured survives the term (*i.e.*, the term expires and the insured is still alive), or if premiums are not paid, the policy expires with no value.

7.     "Cash value" life insurance combines the term insurance component with a savings or "cash value" component.  Unlike term insurance, cash value life insurance can remain in force for the insured's entire life so long as the policyholder maintains a positive account value.  Premiums paid to fund cash value life insurance policies accumulate value over time.  The insurer earns interest on the accumulated value and credits a portion of that interest to the policyholder's account.  The insurer uses the accumulated value to fund the death benefit once the policy matures.  Whether the insured dies when the policy has a high or low accumulated value, the insurance company pays the same death benefit, equal to the face value of the policy, because the accumulated value is part of the death benefit.

8.     Universal life insurance is a form of cash value life insurance also known as "flexible premium" adjustable life insurance.  Like other cash value policies, universal life insurance includes (a) the "mortality" component, for which the insurance company charges a cost to cover the risk of the insured's death (the "cost of insurance"); and (b) a "cash value" component, where premiums paid in excess of the cost of insurance (and certain other policy charges) accumulate (referred to as the "Accumulation Value" in the Policies) and earn interest at a rate that will not be lower than a "guaranteed minimum interest rate" (generally referred to in the life insurance industry as the "guaranteed minimum crediting rate" because the interest is "credited" to the policyholder's account).  The Accumulation Value is

used to fund the policy charges, including the cost of insurance charges, and it makes up part of the death benefit. In other words, the Accumulation Value is part of the coverage of the life insurance policy. When the insurer pays out the death benefit, it makes no distinction between the Accumulation Value and the remaining portion of the death benefit—referred to as the Net Amount at Risk. Indeed, some insurance companies design some universal life insurance policies to be funded in a way that the Accumulation Value equals the death benefit at age 100.

9. Transamerica holds the Accumulation Value for Plaintiffs subject to the terms of the Policies, which prescribe how the Accumulation Value may be used. Policyholders may access the Accumulation Value through procedures referred to as withdrawals or partial surrenders. The Accumulation Value may be substantially withdrawn with no penalty if the policyholder has held the policy for longer than a certain number of years, called the "Surrender Penalty Period." Even if the Surrender Penalty Period has not passed, however, a policyholder may access the Accumulation Value subject to a contractually-defined penalty, which is often minimal. The surrender penalty decreases every year until the policy passes the Surrender Penalty Period.

10. Universal life insurance is designed to give policyholders flexibility, particularly with respect to the payment of premiums. This can be demonstrated by comparing universal life insurance to another type of "cash value" life insurance— whole life insurance. With whole life insurance, a policyholder pays fixed monthly premium payments for the life of a policy. These fixed monthly premium payments include an amount associated with the cost of actual insurance (*i.e.*, the cost for the insurance company to bear the risk of the insured's death) but also an additional amount intended to accumulate a "cash value" that earns interest over time, like the Accumulation Value in a universal life insurance policy. In the insured's earlier years, the fixed premium payments of a whole life policy are typically far higher than the actual cost of the insured's risk of death, and most of the premiums are

used to accumulate cash value that will be used to fund the cost of insurance charges in the later years of the insured's life, when the fixed premium payments are likely to be lower than the actual cost of the insured's risk of death. That is, the "cash value" build-up in the earlier years operates as a "reserve" to pay the death benefit in the later years.

11.     Universal life insurance "unbundles" these two components of a whole life insurance policy (a) so that the funding of the policy is transparent to the policyholder, who can see how the insurance company applies her or his premium payments and what the company deducts for policy charges and credits as interest to the policy account; and (b) to allow the policyholder to decide how much premium to pay, including choosing whether to pay just enough premiums to cover the risk of death (*i.e.*, pay solely for the life insurance) or pay more (subject to certain limitations) and build up a cash value that earns tax-deferred interest (which, among other things, is used to fund the death benefit and can also be used to pay for the cost of insurance in the future). Notably, interest earned on the Accumulation Value is tax-deferred because the Accumulation Value is considered part of the insurance.

12.     Although there is no fixed monthly premium payment that is due under a universal life insurance policy, if the balance in the policy account is insufficient to cover the policy's monthly charges, which include the cost of the insurance and certain other policy charges, the policy will enter a grace period and lapse unless additional premiums are paid.

13.     Universal life insurance policies have both guaranteed and non-guaranteed elements. Guaranteed elements are fixed and determined at a specific time, such as when the policy was issued. Non-guaranteed elements, on the other hand, are not fixed at a specific time and can be adjusted by the life insurance company under the terms of the policy. An example of a guaranteed element is the guaranteed minimum interest (or crediting) rate. An example of a non-guaranteed

element is the Monthly Deduction Rate, which is the rate that Transamerica charges to bear the risk of the insured's death.  (Many universal life insurance policies refer to this as the "cost of insurance" rate because it is the rate that the insurance company charges for the mortality risk.)

14.    Although the Policies permit Transamerica to adjust the Monthly Deduction Rates (by increasing or decreasing them), the Policies limit Transamerica's ability to do so in at least two important ways.  First, any change in the Monthly Deduction Rates must be based on changes to Transamerica's expectations as to future cost factors, such as mortality, expenses, interest, persistency, and applicable federal, state, and local taxes.  Second, any change in the Monthly Deduction Rates must be prospective only: Transamerica cannot raise the Monthly Deduction Rates to recoup past losses or make up for prior shortfalls in expected revenue.  In no case can the Monthly Deduction Rate exceed the table of guaranteed maximum Monthly Deduction Rates in the policy form.

15.    For some Policies, Transamerica has stated that it increased the Monthly Deduction Rates by 74% based solely on changes in its expectations as to mortality.  However, it is highly unlikely that Transamerica's expectations as to future mortality justify any rate increase at all, much less a rate increase of 74%. That is because it is well-known in the life insurance industry that since Transamerica began issuing the Policies many years ago, mortality has *improved*, not *worsened*.  Indeed, in 2015, the same year Transamerica began raising the Monthly Deduction Rates, the National Center for Health Statistics reported that mortality had improved by 16.6% between 2000 and 2014.[1]  Such favorable mortality experience supports a *decrease*, not an increase, in the Monthly Deduction Rates.  Despite this, Transamerica has *increased* the Monthly Deduction

---

[1] Sherry L. Murphy, et al., *Mortality in the United States, 2014*, NCHS Data Brief No. 229, 5 (Dec. 2015).

Rates, and it has done so by as much as 74% for some policies, in blatant breach of the Policies' express and implied terms and conditions.

16.    Following the rate increases, Credit Suisse wrote to Transamerica, among other things criticizing the lack of information Transamerica had provided about the basis for the rate increases.  In its responses to Credit Suisse's letters, Transamerica stated it had increased Monthly Deduction Rates because it expected its future mortality experience to be worse than when the policy was incepted. Transamerica did not provide any additional information, such as how or why its future mortality experience is expected to be worse when it is well known that people today are living longer.

17.    Plaintiffs' counsel, representing other Transamerica policyholders subject to the Monthly Deduction Rate increases, sent letters to Transamerica to request an explanation for the rate increases.  One response letter dated March 14, 2016, subsequently made public in connection with pending litigation, stated only that, at the time its universal life insurance policies were issued, the "general interest rate environment was significantly higher than that of today" and that the "original sales illustration provided at issue projected this policy's performance assuming no change in interest rate throughout the life of the policy."  *See EFG Bank AG, Cayman Branch, et al. v. Transamerica Life Insurance Co.*, 16-cv-08104 (C.D. Cal.), Dkt. No. 184 at ¶ 52.  But, as discussed in more detail herein, interest rates should have a relatively minor impact on Monthly Deduction Rates, and any negative impact they might have on Transamerica's cost of providing insurance should be offset by improved mortality.  Furthermore, in the letters citing the "general interest rate environment," Transamerica expressly referred to declining interest rates dating back to the "mid to late 1990's," which Transamerica emphasized fell below the minimum interest rate guaranteed to policyholders on their policy accounts.  *Id.* at ¶ 16.  Thus, Plaintiffs are informed and believe, and on that basis allege, that Transamerica has imposed its massive rate increase in an

unlawful and improper attempt to recover past losses or make up for prior shortfalls in revenue that the company has experienced since the 1990s or early-2000s and pass on to policyholders the risk and costs associated with guaranteeing them a minimum interest rate, thereby rendering the guaranteed minimum interest rate illusory.

18.     By drastically raising the Monthly Deduction Rates by as much as 74%, it is apparent that Transamerica seeks to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies and forfeit the premiums they have paid to date, thereby depriving policyholders of the benefits of their policies.  Transamerica, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the vast majority of the premiums that have been paid to date on them.

19.     Transamerica's misconduct, as described more fully herein, constitutes not only express breaches of the Policies, but also breaches of the implied covenant of good faith and fair dealing.  Plaintiffs therefore seek compensatory and punitive damages, as well as equitable relief and attorneys' fees.

20.     Indeed, in apparent response to complaints about a similar rate increase imposed by another life insurance company, the New York Department of Financial Services ("NYDFS") recently proposed a new regulation to protect policyholders "from unjustified life insurance premium increases."[2]  The regulation would give NYDFS the opportunity to review potential rate increases by requiring life insurance companies to notify NYDFS "at least 120 days prior to an adverse

---

[2] *See* Press Release, NYDFS, *DFS Proposes New Regulation to Protect New Yorkers from Unjustified Life Insurance Premium Increases* (Nov. 17, 2016), http://www.dfs.ny.gov/about/press/pr1611171.htm.

change in non-guaranteed elements of an in-force life insurance or annuity policy."[3] The regulation also would require insurers to notify policyholders "at least 60 days prior to an adverse change in non-guaranteed elements of an in-force life insurance or annuity policy."[4]  In addition, the regulation would require insurers to "establish board-approved criteria for determining non-guaranteed charges or benefits" and would mandate a NYDFS review of "the anticipated experience factors and non-guaranteed elements for existing policies whenever the non-guaranteed elements on newly issued policies are changed."[5]  The regulation defines experience factors as "investment income, mortality, morbidity, persistency, or expense that represents the insurer's financial experience on a policy."[6]  "Profit margin is not an experience factor."[7]

21.    In announcing the proposed regulation in a press release dated November 17, 2016, NYDFS Superintendent Maria Vullo declared that New York "will not stand by and provide life insurers free reign to implement unjustified cost of insurance increases on New Yorkers simply to boost profits."[8]

22.    An article in *The Wall Street Journal* published the same day notes that although the regulation would apply only in New York, it "could be widely copied by other insurance departments."[9]

---

[3] *Id.*

[4] *Id.*

[5] Life Insurance & Annuity Non-Guaranteed Elements §48.2, 11 NYCRR 48.

[6] *Id.*

[7] *Id.*

[8] Press Release, NYDFS, *supra* note 2.

[9] Leslie Scism, *New York Regulator Aims to Require Life Insurers Justify Higher Rates on Old Policies*, Wall St. J. (Nov. 17, 2016), http://www.wsj.com/articles/new-york-regulator-aims-to-require-life-insurers-justify-higher-rates-on-old-policies-1479394201.

## THE PARTIES

23.    Plaintiff Primary MasterBareAF PTC Limited, which brings this action on behalf of and as trustee of the CSSEL Guernsey Bare Trust, is a Guernsey-domiciled company with its principal place of business in Guernsey.  Primary MasterBareAF PTC Limited, as trustee of the CSSEL Guernsey Bare Trust, is the owner and beneficiary of certain Policies at issue in this case.

24.    Plaintiff Credit Suisse Lending Trust (USA) is a Delaware statutory trust.  Credit Suisse Lending Trust (USA) was formerly known as Eden Park Financing Trust I.  The Minnesota trustee of Credit Suisse Lending Trust (USA) is Wells Fargo Bank, National Association ("Wells Fargo").  The statutory trustee of Credit Suisse Lending Trust (USA) is Wells Fargo Delaware Trust Company.  Credit Suisse Management LLC is the holder of the sole undivided beneficial interest in Credit Suisse Lending Trust (USA).  Credit Suisse Management LLC is a Delaware limited liability company and a wholly-owned subsidiary of Credit Suisse (USA), Inc.  Credit Suisse (USA), Inc. is a Delaware corporation with its principal place of business in New York.  Plaintiff Credit Suisse Lending Trust (USA) is the assignee of, and has full rights, title, and interest in, certain life insurance policies at issue in this case.

25.    Plaintiff Credit Suisse Lending Trust (USA) 5 is a Delaware statutory trust.  The Minnesota trustee of Credit Suisse Lending Trust (USA) 5 is Wells Fargo.  The statutory trustee of Credit Suisse Lending Trust (USA) 5 is Wells Fargo Delaware Trust Company.  Credit Suisse Management LLC is the holder of the sole undivided beneficial interest in Credit Suisse Lending Trust (USA) 5.  Credit Suisse Management LLC is a Delaware limited liability company and a wholly-owned subsidiary of Credit Suisse (USA), Inc.  Credit Suisse (USA), Inc. is a Delaware corporation with its principal place of business in New York.  Plaintiff Credit Suisse Lending Trust (USA) 5 is the assignee of, and has full rights, title, and interest in, a certain life insurance policy at issue in this case.

26.    Upon information and belief, Defendant Transamerica Life Insurance Company is an Iowa corporation with its principal place of business located in Cedar Rapids, Iowa, and Transamerica Life Insurance Company is authorized to do business in the State of California and regularly conducts its business in the State of California, including within this judicial district.

## FACTUAL BACKGROUND

**A.    Plaintiffs Are Owners of Transamerica Universal Life Insurance Policies Subject to Transamerica's Rate Increases**

27.    Plaintiff Primary MasterBareAF PTC Limited, as trustee of the CSSEL Guernsey Bare Trust, is the owner and beneficiary of 17 Transamerica policies that are subject to Transamerica's increase in Monthly Deduction Rates.  These policies were issued between 1993 and 2006 and are listed on the attached **Exhibit 1** (the "Guernsey Policies").  The Guernsey Policies were issued in Arizona, Florida, Georgia, Minnesota, Nebraska, Pennsylvania, and Texas.  A sample Guernsey policy, redacted for privacy, is attached hereto as **Exhibit 2** ("Guernsey Doe Policy").  Primary MasterBareAF PTC Limited, as trustee of the CSSEL Guernsey Bare Trust, is listed on Transamerica's records as the owner and beneficiary of the Guernsey Policies and is the entitlement holder owning the ultimate financial interest in the Guernsey Policies.

28.    Plaintiffs Credit Suisse Lending Trust (USA) and Credit Suisse Lending Trust (USA) 5 are the collateral assignees of 13 Transamerica policies that are subject to Transamerica's increase in Monthly Deduction Rates.  These policies, all of which were issued in California or Minnesota, are listed on the attached **Exhibit 3** (the "Lending Trust Policies," and together with the Guernsey Policies, the "Plaintiff Policies").  Between 2005 and 2006, the predecessors in interest to Credit Suisse Lending Trust (USA) and Credit Suisse Lending Trust (USA) 5 made loans to life insurance trusts formed by the individuals to finance their purchase of life insurance.  These loans are secured by the policies themselves, and the trustees

of the life insurance trusts executed collateral assignments, which assigned as collateral to the predecessors in interest of Credit Suisse Lending Trust (USA) and Credit Suisse Lending Trust (USA) 5, and now to Credit Suisse Lending Trust (USA) and Credit Suisse Lending Trust (USA) 5, "all of [the trustee's] claims, options, privileges, rights, title and interest in, to and under the [Lending Trust Policy]."  A sample Lending Trust Policy, redacted for privacy, is attached hereto as **Exhibit 4** ("Lending Trust Doe Policy").  A sample collateral assignment and Transamerica's acknowledgment of the collateral assignment, redacted for privacy, is attached hereto as **Exhibit 5**.  These loans remain outstanding and subject to the collateral assignments.  Credit Suisse Lending Trust (USA) and Credit Suisse Lending Trust (USA) 5 therefore have asserted their claims as assignees of the claims.

### B.    Plaintiffs Acquired Their Interests in the Policies Through the Secondary Market and Premium Finance Loans

29.    In recent years, financial institutions have acquired life insurance policies on the secondary market (sometimes referred to as the "life settlement" market).  A "life settlement" refers to the sale of a life insurance policy to a third party for a value greater than the policy's cash surrender value and less than the death benefit.  The seller receives a cash payment, while the purchaser assumes all future premium payments and receives the death benefit upon the death of the insured.

30.    Some financial institutions also have provided premium finance loans to consumers to fund the premium payments in connection with their purchase of life insurance.  These premium finance loans are often secured by the life insurance policies, and they provide a benefit to consumers because consumers who might not otherwise buy life insurance, particularly elderly consumers, are willing to do so if they are able to finance the premium payments.

31.     Premium finance loans are available—and life settlements are possible—because life insurance policies, like other property, are freely assignable. *See Grigsby v. Russell*, 222 U.S. 149, 155-56 (1911).  As Justice Oliver Wendell Holmes observed over a century ago, "life insurance has become in our days one of the best recognized forms of investment and self-compelled saving.  So far as reasonable safety permits, it is desirable to give life policies the ordinary characteristics of property."  Consistent with *Grigsby*, many state laws, including California law, expressly provide that life insurance policies are transferable.  *E.g.,* Cal. Ins. Code § 10130 ("A life or disability policy may pass by transfer, will or succession to any person, whether or not the transferee has an insurable interest.").

32.     Before the existence of a robust secondary market for life insurance policies, consumers who owned a life insurance policy but no longer needed or wanted it (or could no longer afford it)—often a senior who had outlived her or his savings—had two economically inefficient options: (i) let the policy lapse and receive nothing in return for the termination of the policy; or (ii) surrender the policy back to the insurance company in exchange for a cash surrender value that was typically a nominal amount.  Lapsing or surrendering a policy almost always results in a loss to the consumer and a windfall for the insurance company, which keeps most, if not all, of the premiums paid to date and never has to pay any death benefits to the policyholder.  Without a competitive market of buyers, insurance companies held all the cards.  Senior insureds, lacking choices, held none.

33.     The emergence of the secondary market for life insurance has addressed this market deficiency by providing consumers with a third, often superior option: they can sell (or "settle") their policies to someone other than the insurance company on an open, competitive market.  The buyer, often a bank, insurance company, or pension fund seeking investments uncorrelated to the traditional equity and debt capital markets may offer the consumer as much as, or even more than, ten times the cash surrender value offered by the insurance

company (in 2016, for example, insureds' policies sold for, on average, seven times the cash surrender value).[10]  The buyer continues to pay premiums and will receive the death benefit when the policy matures.  This secondary market has benefited consumers, particularly older age policyholders who no longer wish to keep paying for life insurance, by providing a liquid market where they can sell their policies for fair value, as opposed to just lapsing or surrendering their policies to the insurance company that issued them and receiving nothing or very little in return (a big win for insurers but a big loss for consumers).

34.    Indeed, governmental agencies have recognized the benefits of the secondary market to consumers.  For example, in a July 2010 Report to the United States Senate Special Committee on Aging, the Government Accountability Office ("GAO Report") observed: "A policy owner with unneeded life insurance can surrender the policy to the insurer for its cash surrender value.  Or, the owner may receive more by selling the policy to a third-party investor through a life settlement."[11]  The United States Securities and Exchange Commission similarly observed that "[i]nsured individuals or policy owners sell their policies in the secondary market rather than allowing them to lapse or surrendering them to the insurance company for cash value to maximize their asset."[12]

35.    Insurance companies like Transamerica embraced the secondary market because it helped them sell more insurance.  Consumers who would not otherwise buy life insurance purchased insurance with the comfort they could later sell their policies for fair market value if they did not need or want to keep their

---

[10] Peter Hershon, *More than 8 in 10 Seniors Unaware of Life Settlement Option*, ThinkAdvisor, May 12, 2016, https://www.thinkadvisor.com/2016/05/12/more-than-8-in-10-seniors-unaware-of-life-settleme/?slreturn=20190824185302.

[11] United States Government Accountability Office, Report to the Special Committee on Aging, U.S. Senate, "Life Insurance Settlements: Regulatory Inconsistencies May Pose a Number of Challenges," GAO-10-775, July 2010.

[12] Life Settlements Task Force, Staff Report to the United States Securities and Exchange Commission, July 22, 2010.

FIRST AMENDED COMPLAINT
CASE NO. 2:20-cv-02516-CAS(GJSx)

policies.  Indeed, Transamerica itself in 2007 planned to enter the life settlement market, with then-President Ken Kilbane telling the company's agents "we believe this market will prove to be quite viable for you and Transamerica" while observing that "[t]here are millions of potential customers who are looking for a fair settlement for policies they no longer need."[13]

36.    Insurance companies also embraced premium financing because the ability of consumers to finance their premium payments helped insurance companies sell more policies and collect more premiums.  This is because consumers, particularly elderly consumers, were more willing to purchase life insurance if they could finance their premiums.

37.    But after reaping the benefits of hundreds of millions, if not billions, of dollars in premiums collected over the past two decades, particularly from older age insureds, Transamerica has targeted many of these policies for Monthly Deduction Rate increases.  Its purpose is clear: force policyholders (including investors that purchased their policies in the secondary market, consumers that financed their premiums, and lenders that hold security interests in such policies) either to pay exorbitant rates to keep their policies in force or lapse or surrender their policies, thereby destroying the economic benefit of the policies.  If companies like Transamerica are not deterred from executing such a strategy, they will cripple—if not ultimately destroy—the secondary market because secondary market purchasers will not want to incur the risks of such unlawful rate increases.

38.    A weakened secondary market would be of particular concern to senior insureds, who stand to lose significant value from any obstacles to selling their policies.  For example, one 2012 study showed that four out of ten seniors had lapsed or surrendered their life insurance policies;[14] another showed that, of those

---

[13] Matt Brady, "Transamerica Has Plans To Enter The Life Settlement Market," LifeHealthPro, Aug. 19, 2007.

[14] *Four Out of Ten Lapse or Surrender Life Insurance*, BusinessWire, April 8, 2013, https://www.businesswire.com/news/home/20130408006630/en/Ten-Seniors-

seniors who had lapsed or surrendered their policies, "90 percent" indicated they would have considered selling their policies in the secondary market "had they known about it."[15]  The Life Insurance Settlement Association, citing a report using publicly available information from 2010, found that more than 250,000 universal and variable life insurance policies lapsed each year—with combined face values of over $57 billion—among seniors alone.[16]  Thus, when insurance companies like Transamerica impermissibly raise Monthly Deduction Rates in contravention of the Policies' clear contractual terms, they are hurting not only the policyholders, but the entire secondary market, including hundreds of thousands of senior consumers.

39.     Plaintiffs Primary MasterBareAF PTC Limited, as trustee of the CSSEL Guernsey Bare Trust, Credit Suisse Lending Trust (USA), and Credit Suisse Lending Trust (USA) 5 acquired their interests in the Plaintiff Policies through either life settlements or premium finance loans.  With respect to the policies acquired through premium finance loans (the "Loan Policies"), the policies are currently held (in the case of all the Lending Trust Policies), or were previously held (in the case of the Guernsey Policies that are Loan Policies), by insurance trusts created by the insureds, which collaterally assigned all their right, title, and interest in the Loan Policies to the Plaintiffs or another entity that has assigned its interests in the policies to the Plaintiffs (collectively, the "Lender Entities") as security for the premium finance loans.  The Lender Entities issued the premium

---

Lapse-Surrender-Life-Insurance (last accessed September 24, 2019); *see also* Scott Page, *Let Life Insurance Lapse at Your Own Risk*, HuffPost, May 9, 2013, https://www.huffpost.com/entry/let-life-insurance-lapse-at-own-risk_b_3239095?guccounter=1 ("Individuals pay hundreds of millions of dollars into life insurance every year, yet four out of 10 seniors lapse or surrender their policies before they receive any payout.").

[15] Peter Hershon, *More than 8 in 10 Seniors Unaware of Life Settlement Option*, ThinkAdvisor, May 12, 2016, https://www.thinkadvisor.com/2016/05/12/more-than-8-in-10-seniors-unaware-of-life-settleme/?slreturn=20190824185302.

[16] Darwin Bayston, *Lapsed Life Insurance Policies: An Astounding Number*, Life Insurance Settlement Association, February 24, 2015, https://www.lisa.org/life-policy-owners/consumer-blog/blog/2015/02/25/lapsed-life-insurance-policies-an-astounding-number.

FIRST AMENDED COMPLAINT
CASE NO. 2:20-CV-02516-CAS(GJSx)

finance loans to consumers pursuant to financing agreements. However, under these financing agreements, the Lender Entities were not obligated to make additional advances to cover the premium increase resulting from Transamerica's Monthly Deduction Rate increases. Thus, after Transamerica increased the Monthly Deduction Rates on the Loan Policies, the Lender Entities advised the insured trusts that they would need to pay the increased monthly deductions. For almost all the Loan Policies, the insured trust was unable to afford or unwilling to pay the increased monthly deductions. In many instances, the higher Monthly Deduction Rates caused the insured to default on the premium finance loan, forcing the Lender Entities to foreclose. In other instances, the insureds sold or surrendered their policies to the Lender Entities to avoid having to pay the increased monthly deductions. Finally, in other instances, the insureds agreed to accept a decreased net death benefit to offset the exorbitant monthly deductions required to keep their policies in force and avoid defaulting on their loans.

40.    The initial policyholders for the 13 Lending Trust Policies—trusts established by the insureds to own the policies, and therefore the insureds themselves—are the owners of the Lending Trust Policies, and they continue to maintain their premium finance loans. These insureds are all of advanced age: the average age of the insureds for the Lending Trust Policies is 93. All are expecting their portion of the death benefit when their policies mature, and they cannot easily turn to the market to obtain another policy. With each premium payment made to Transamerica, their loan balances go up, and when Transamerica increased the MDRs, it was the owners that had to pay the additional premiums to keep their policies in force or adjust their loan agreements to borrow more from the Lender Entities and/or reduce their net death benefits.

## C.    Transamerica Raises Monthly Deduction Rates

41.    As is typical of universal life insurance policies, the Plaintiff Policies provide that they will remain in force as long as there are sufficient funds in the

policy account each month to cover the monthly policy charges (referred to in the

Policies as the "Monthly Deduction").  As stated in the Policies, the Monthly

Deduction, which includes the cost of insurance and certain other policy

charges/fees, is equal to:

> (a)    the Monthly Deduction Rate, times .001, times the
> difference between the death benefit and the Accumulation
> Value of the policy (or of each Layer, respectively) at the
> beginning of the policy month;

plus    (b) the Monthly Deduction for any Riders;

plus    (c) the Policy Fee;

plus    (d) the monthly expense charge per thousand rate times .001,
        times the face amount of the policy (or of each Layer,
        respectively).

Guernsey Doe Policy, Ex. 2, at 14; Lending Trust Doe Policy, Ex. 4, at 14.

42.    Element (a) of the Monthly Deduction formula above is the cost of

insurance, which is the largest and most significant charge.  As shown above, it is

determined by multiplying the Monthly Deduction Rate (the cost of insurance rate)

times .001 times the difference between the death benefit and the Accumulation

Value of the policy.  The rate is multiplied by .001 because the rate is per $1,000 of

insurance.  Furthermore, the Accumulation Value is deducted from the death

benefit because, although the Accumulation Value is part of the death benefit paid

upon the insured's death, policyholders do not pay cost of insurance on the

Accumulation Value, which is the savings component of the Policies and not the

"insurance."

43.    After deducting the Monthly Deduction from the policy account, any

balance that is left reflects the ending policy account value or "Accumulation

Value," which accrues interest at a rate that cannot be lower than the guaranteed

minimum interest rate (4% for the Doe Policies).  Guernsey Doe Policy, Ex. 2, at 2,

13; Lending Trust Doe Policy, Ex. 4, at 2, 13.  If in any month there are insufficient funds in the account to cover the Monthly Deduction, the policy will enter a grace period.  If additional premiums are not paid within the grace period, Transamerica will terminate, or lapse, the policy.  The grace period depends on the individual policy, but for the Doe Policies, it is 61 days.  *See* Guernsey Doe Policy, Ex. 2, at 10-11; Lending Trust Doe Policy, Ex. 4, at 10-11.

44.   The Monthly Deduction Rates under the Plaintiff Policies are based initially on certain characteristics of the insured, including her or his gender, age, and risk class.  The Monthly Deduction Rates increase every year as the insured ages.

45.   The Plaintiff Policies state that Transamerica "will determine the Monthly Deduction Rate for each policy month at the beginning of that policy month."  Guernsey Doe Policy, Ex. 2, at 14; Lending Trust Doe Policy, Ex. 4, at 13.  Some of the Plaintiff Policies further provide:

> Any change in the Monthly Deduction Rates will be prospective and will be subject to our expectations as to future cost factors.  Such cost factors may include, but are not limited to: mortality; expenses; interest; persistency; and any applicable federal, state and local taxes.

*See, e.g.*, Guernsey Doe Policy, Ex. 2, at 14; Lending Trust Doe Policy, Ex. 4, at 14.  The Policies thus expressly contemplate not only increases in Monthly Deduction Rates but also *decreases* in Monthly Deduction Rates when Transamerica has favorable or improved expectations as to future cost factors.

46.   The Plaintiff Policies further state that Transamerica "do[es] not distribute past surplus or recover past losses by changing the Monthly Deduction rates."  Guernsey Doe Policy, Ex. 2, at 25; Lending Trust Doe Policy, Ex. 4, at 23.

47.   Accordingly, among many other things, under the terms of the Plaintiff Policies, any change in the Monthly Deduction Rates (a) can only be based on

1   Transamerica's expectations as to future cost factors; and (b) must be prospective

2   only: Transamerica cannot change rates to recover past losses (or distribute past

3   surplus).

4        48.    In or about June 2015, Transamerica began notifying policyholders

5   that it was raising the Monthly Deduction Rates on certain of its in-force universal

6   life insurance policies.  Sample letters for the Guernsey Doe Policy and the Lending

7   Trust Doe Policy are attached hereto as **Exhibit 6 and Exhibit 7**, respectively.  The

8   letters disclose rate increases ranging from 11% to as much as 74%.  The letters

9   also represent that the rate increase applies equally to all policies of a particular

10  policy type (*i.e.*, the rate increase is not limited to a subset of such policies).  *See,*

11  *e.g.*, Ex. 7 ("We are increasing the monthly deduction rates for all TransUltra EX

12  TULTRVX5 policies[.]").  Although Transamerica stated generally that it was

13  increasing the Monthly Deduction Rates "based on our current expectations

14  regarding our future costs of providing this coverage," it did not say what cost

15  factors it was relying upon in support of its rate increase.

16       49.    In 2016 and 2017, Credit Suisse, through the former securities

17  intermediary for certain Policies, sent letters to Transamerica sent letters to

18  Transamerica concerning the basis for Transamerica's rate increases, including

19  Transamerica's failure to identify what cost factors it contended justified the

20  increase.  Transamerica's responses to those letters were vague, evasive, and

21  misleading.

22       50.    In letters responding to Credit Suisse, Transamerica stated that it

23  considers numerous factors in determining whether to exercise its discretion to

24  increase Monthly Deduction Rates and identified mortality as the specific cost

25  factor it relied upon to increase Monthly Deduction Rates: "Transamerica

26  determined the future projected policy performance warranted an increase in the

27  Monthly Deduction Rates . . . Specifically, Transamerica's [sic] determined that

28  future mortality experience is projected to be less favorable going forward on this

block than anticipated at policy inception.  As expressly permitted by the Policy, Transamerica increased the Monthly Deduction Rates as a result of this cost factor." *See, e.g.*, **Exhibit 8**, dated October 28, 2016.

51.    Transamerica's refusal to provide any meaningful information has prevented policyholders like Plaintiffs from verifying the accuracy of Transamerica's representations that its rate increase is justified by changes in assumptions as to mortality and interest.  It is likely for this very reason that NYDFS proposed its new regulation, which would require life insurance companies like Transamerica to notify NYDFS and policyholders in advance of any adverse change in the non-guaranteed elements of an in-force life insurance policy and would mandate regulatory review of the anticipated experience factors, such as mortality and interest.

52.    Regardless, it is apparent that Transamerica's increase in the Monthly Deduction Rates breaches the terms of the Plaintiff Policies in at least four ways. *First*, the increase in Monthly Deduction Rates is not based on Transamerica's expectations as to future cost factors.  *Second*, the rate increase impermissibly attempts to circumvent the minimum guaranteed interest rate under the Plaintiff Policies.  *Third*, the rate increase appears to be an improper attempt to recover prior losses or shortfalls caused by declining interest rates beginning in the mid-1990s. *Fourth*, the rate increase breaches the implied covenant of good faith and fair dealing that exists in every insurance contract.

**D.    The Increase in Monthly Deduction Rates Is Not Based on Expectations as to Future Cost Factors**

53.    The Doe Policies state that Transamerica may base a change in the Monthly Deduction Rates only on changes in its expectations as to future cost factors.  These cost factors include mortality, expenses, interest, persistency, and any applicable federal, state and local taxes.  To be "subject to" future cost factors,

1   the magnitude of any change in Monthly Deduction Rates must correspond to any

2   changes in future cost factors.

3   **Mortality**

4   54.   ***First***, Transamerica has relied solely on mortality in increasing the

5   Monthly Deduction Rates for at least some of the Plaintiff Policies.  Ex. 8.

6   55.   While mortality is the most significant factor in providing life

7   insurance coverage, it is well known in the life insurance industry that over the past

8   20 to 30 years, mortality has improved, not worsened, and people are living much

9   longer than anticipated several years ago when Transamerica priced the Policies.

10  For example, in 2015, the National Center for Health Statistics reported

11  "[s]ignificant decreases in mortality in 2014 compared with 2013" and observed

12  that this year-to-year improvement was "consistent with long-term trends."[17]

13  "Although year-to-year changes are usually relatively small," explained the

14  National Center for Health Statistics, "the age-adjusted death rate in the United

15  States decreased 16.6% between 2000 (869.0) and 2014 (724.6)."[18]  This "long-

16  term trend" of improving mortality is also evidenced by the release of several new

17  mortality tables over the past two decades that would, if anything, support a

18  decrease in the Monthly Deduction Rates, not an increase in rates as high as 74%.

19  56.   Specifically, in 2001, the Society of Actuaries ("SOA") and the

20  American Academy of Actuaries ("AAA") produced the 2001 Commissioner's

21  Standard Ordinary ("CSO") Table, which replaced the previous 1980 CSO Table to

22  reflect significant improving mortality.  Upon information and belief, the maximum

23  Monthly Deduction Rates allowed under the Transamerica Policies are based on the

24  older 1980 CSO Table, not the newer 2001 CSO Table.  The SOA also is currently

25  investigating an update of the 2001 CSO Table, and a 2015 investigative report by

26  the SOA showed significant reductions in insurance company reserves compared to

27

28  ―――――――――――――――
[17] Murphy, *supra* note 1, at 5.
[18] *Id.*

FIRST AMENDED COMPLAINT
CASE NO. 2:20-cv-02516-CAS(GJSx)

the 2001 CSO Table due to mortality improvements since 2001.  In 2008, the SOA also released a 2008 Valuation Basic Table ("VBT") that reflected significant mortality improvements compared to prior tables.  In 2014, the SOA released the 2014 VBT, which showed overall mortality improvement from the 2008 VBT.

57.   These new mortality tables demonstrate that since Transamerica originally priced the Policies (as early as the 1980s or 1990s), mortality has improved, not worsened, and this change in mortality would support a ***decrease***, not an increase, in the Monthly Deduction Rates.

58.   Transamerica's regulatory filings over the past several years also do not reflect any adverse changes to mortality that would support its rate increase. Each year, life insurance companies file with state insurance departments a Statement of Nonguaranteed Elements, which answers certain interrogatories about the nonguaranteed elements of their policies.  Interrogatory No. 4 asks whether Transamerica's "anticipated experience factors underlying any nonguaranteed elements [are] different from current experience."  Transamerica's Statements of Nonguaranteed Elements from 2011 to 2015 are attached hereto as **Exhibits 9 to Exhibit 13**, respectively.  In the four years preceding Transamerica's initial rate increase in 2015, Transamerica never once stated that its anticipated mortality was worse than its current experience.  *See* Exs. 9-12 (Answers to Interrogatory No. 4). It was not until December 31, 2015 that Transamerica suggested for the first time that it anticipated adverse mortality.  Even then, however, Transamerica did not identify mortality specifically, but stated only very generally that "[c]urrent mortality, persistency, investment, tax and expense levels are generally different from those anticipated in the pricing of some products."  Ex. 13 (Answer to Interrogatory No. 4).  This statement was made just months before it notified many policyholders that it was increasing the Monthly Deduction Rates on certain Policies, which Transamerica later stated was due solely to less favorable mortality projections, making no mention of "persistency, investment, tax and expense

levels," as stated in its most recent Statement of Nonguaranteed Elements. *See* Ex. 7 (June 20, 2016 Increase Notice Letter notifying of a 74% increase in the Monthly Deduction Rates). It is implausible that in just one year, Transamerica went from anticipating no changes in mortality to anticipated mortality changes that it claims justify a 74% increase in the Monthly Deduction Rates.

**Interest**

59.    While "interest" is listed as a cost factor upon which Transamerica may base a change in the Monthly Deduction Rates, Plaintiffs are informed and believe, and on that basis allege, that Transamerica's rate increase is based on a decline in interest rates going back to the mid to late 1990s. This historic decline in interest rates cannot be the basis for a change in Monthly Deduction Rates because the Policies require that any change in the Monthly Deduction Rates be subject to Transamerica's expectations as to "future" cost factors, and they prohibit Transamerica from changing the Monthly Deduction Rates to recover past losses. *See infra* section F.

60.    Moreover, even if lower interest rates may impact Transamerica's cost of providing insurance, they would not justify an increase in Monthly Deduction Rates as high as 74% because interest rates should be a relatively minor factor in calculating Transamerica's cost of insurance (and, consequently, its Monthly Deduction Rates).

61.    To begin with, as it relates to Monthly Deduction Rates, "interest" (one of the cost factors Transamerica may consider) can only refer to the interest that Transamerica earns (or expects to earn) on its profits from providing insurance, and not on funds in its policyholders' accounts. As explained above, universal life insurance policies, like the Policies, consist of two distinct components – (a) the life insurance, or "mortality," component; and (b) the Accumulation Value, or "savings," component. Transamerica earns interest on both of these components.

62.     However, although a life insurance company may earn interest on both the mortality component and the savings component, it can only consider interest it earns on the mortality component when determining the ***cost of insurance***; the interest it earns from investing funds in policyholder accounts is only relevant to setting the interest rate credited to those accounts.  This is because the cost of insurance is the mortality charge.  It is intended to cover the risk of the insured's death, not the interest rate risk associated with policyholder accounts (and guaranteeing policyholders a minimum interest rate on their policy accounts).

63.     The cost of insurance charge includes an expected profit over the insurance company's expected mortality.  The insurance company then expects to invest this profit and earn interest on it.  The company then factors this profit and the interest on this profit in setting the cost of insurance rates (or, here, the Monthly Deduction Rates).  Lower interest rates may result in lower interest income, but lower interest rates would not result in a loss unless the insurance company's investments had a negative return.  But this is highly unlikely to occur because most life insurance companies invest primarily in fixed-income securities, such as bonds.  Thus, to the extent Transamerica is raising the Monthly Deduction Rates because it is earning less interest on its mortality profits, it is highly unlikely that this lower interest income would justify an increase in Monthly Deduction Rates, much less one as high as 74%.

64.     To illustrate this, assume Transamerica's cost of insurance contemplated a 20% mortality profit.  For every $120 in cost of insurance charges received in a year, Transamerica would expect to pay out $100 in claims, leaving $20 in mortality profits to invest.  If it assumed it would earn 5% interest on the profit of $20 in that year, it would expect to earn $1.00 of interest.  If it now expects to earn 1% instead of 5%, the interest would drop to $0.20 instead of $1.00.  But this 80% drop in interest income would not translate to an 80% increase in Monthly Deduction Rates because it does not capture the $20 mortality profit.  In other

words, Transamerica is earning $20.20 instead of $21.00 on the mortality component, which is a difference of less than 4%, assuming mortality is as expected. If Transamerica experienced favorable mortality, that favorable mortality experience should also offset the cost associated with the lower than expected interest. Although this is a very rudimentary example, it illustrates how a decline in interest is not likely to result in a rate increase as high as 74%.

65.    As to the interest earned on the savings component of a universal life insurance policy, a life insurance company expects to earn a spread on the funds that policyholders maintain in their policy accounts. That is, if the life insurance company is earning 8% interest on policyholder accounts, it may credit policyholders 7% and earn a spread of 1%. If interest rates are low and the company is earning only 5% interest, it may lower the crediting rate to 4% and still earn a 1% spread. Thus, even if Transamerica could consider the interest it earns from investing funds in policyholders' accounts (which it cannot), this would not justify an increase in Monthly Deduction Rates, but only a change in the interest rate credited to policyholder accounts.

66.    However, if Transamerica expects to earn only 3% interest from investing funds in policyholders' accounts, Transamerica cannot reduce the crediting rate to 2% because this rate would be below the 4% guaranteed minimum interest rate credited to policyholders. Nor, however, can Transamerica attempt to offset this loss by raising the Monthly Deduction Rates. If it could, the cost of insurance (which is calculated by using Monthly Deduction Rates) would not be a mortality charge, but a way for Transamerica to guarantee its profitability on the Policies by transferring to policyholders all risk under the Policies, including the interest rate risk on Policy Accumulation Values and the risk of interest rates falling below the guaranteed minimum interest rate. This would render the guaranteed minimum interest rate meaningless.

67.    Furthermore, even if Transamerica is properly considering only interest on its mortality profits, to the extent Transamerica is raising Monthly Deduction Rates to achieve its original profit expectations, the rate increase is improper because Transamerica cannot raise Monthly Deduction Rates simply to guarantee itself its original profit expectations.  As NYDFS has said, life insurance companies do not have free reign to raise COI rates "simply to boost profits" because profit margin is not an experience factor.[19]

68.    In light of this, and given the magnitude of Transamerica's rate increase, Plaintiffs are informed and believe, and on that basis allege, that Transamerica has imposed the rate increase, not because its mortality and interest experience has been unfavorable enough to require an increase in Monthly Deduction Rates, but solely to boost its profits.  Profit is not a factor that Transamerica can consider in changing Monthly Deduction Rates.  Furthermore, using Monthly Deduction Rates to guarantee Transamerica's original profitability assumptions, and thereby placing its interest in maximizing gains over the rights of policyholders, would constitute a breach of the implied covenant of good faith and fair dealing.

69.    In sum, by drastically raising Monthly Deduction Rates on the Plaintiff Policies, Transamerica seeks to force Plaintiffs either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (b) lapse or surrender their policies, thereby forfeiting the premiums they have paid over the last decades.  Transamerica, in turn, will make a huge profit – either through higher premium payments or by eliminating a large group of policies (through lapses or surrenders) and keeping the premiums that have been paid to date.  As the NYDFS Superintendent stated in regards to NYDFS's

---

[19] Press Release, NYDFS, *supra* note 2.

proposed regulation to address this very issue:  Life insurers do not have "free reign
to implement unjustified cost of insurance increases . . . simply to boost profits."

### E. The Increase in Monthly Deduction Rates Is an Impermissible Attempt to Circumvent the Guaranteed Minimum Interest Rate

70.    Under the express terms of the Plaintiff Policies, a policyholder has the
right to pay just enough premiums to cover the Monthly Deduction.  If the
policyholder contributes more than needed to cover the Monthly Deduction, leaving
a balance remaining in the policy account, the Plaintiff Policies provide that the
balance will accrue interest at a rate no lower than the guaranteed minimum interest
rate.  Guernsey Doe Policy, Ex. 2, at 13; Lending Trust Doe Policy, Ex. 4, at 13.
The guaranteed minimum interest rate provided for under the Plaintiff Policies is
4%.

71.    In responses provided to counsel representing other affected
policyholders, Transamerica suggested that low interest rates were at least one
reason for Transamerica's increase in the Monthly Deduction Rates.  To the extent
Transamerica considered the interest it earns on funds in policyholder accounts, the
rate increase also violates the Plaintiff Policies' guaranteed minimum interest rate
provision.  This is evident because if the interest Transamerica earned on funds in
policyholder accounts did not drop near or below the guaranteed minimum interest
rate it credits to policyholders, Transamerica could simply address the change in
interest rates by lowering the interest rate credited to policyholders.  But if
Transamerica is raising Monthly Deduction Rates instead of lowering the interest
rate credited to policyholders, this presumably is because lowering the interest rate
credited to policyholders would not be sufficient for Transamerica – because it is
earning interest near or below the guaranteed minimum interest rate (thus, reducing
its originally anticipated spread).  By raising Monthly Deduction Rates to account
for this, however, Transamerica is trying to do indirectly what it cannot do directly:
it is using Monthly Deduction Rates to achieve an interest crediting rate that is

lower than the guaranteed minimum interest crediting rate, which violates the Plaintiff Policies.

72.    In short, Transamerica is trying to take the "guarantee" out of the guaranteed minimum interest rate.  By depriving policyholders of the right to the guaranteed minimum interest rate, Transamerica has breached not just the express terms of the Plaintiff Policies, but also the implied covenant of good faith and fair dealing.

**F.    Attempting to Recoup Prior Losses**

73.    The Plaintiff Policies also state that Transamerica "do[es] not distribute past surplus or recover past losses by changing the Monthly Deduction Rates."  Guernsey Doe Policy, Ex. 2, at 25; Lending Trust Doe Policy, Ex. 4, at 23.

74.    Not only is Transamerica's increase in Monthly Deduction Rates not based on changes in future cost factors, but by basing the rate increase on interest rates that have existed since the mid to late 1990s, the rate increase also is intended to recover past losses or profit shortfalls since that time.  The rate increase therefore violates the requirement under the Plaintiff Policies that any rate increase be prospective and the prohibition that Transamerica not change the Monthly Deduction Rates to recover past losses.

75.    Plaintiffs are informed and believe, and on that basis allege, that it is more likely that Transamerica improperly imposed such large Monthly Deduction Rate increases to recoup self-inflicted harm created by Transamerica's payment of massive dividends to its Dutch parent, AEGON. In 2010-2014 alone, Transamerica paid dividends totaling over $2 billion that benefited its ultimate Dutch parent company, AEGON.

**<u>COUNT I</u>**

**(Breach of Contract – Express)**

**(All Policies)**

76.     Plaintiffs reallege the allegations contained in paragraphs 1 through 75, inclusive, as if set forth fully herein.

77.     The Plaintiff Policies are binding and enforceable contracts.

78.     Defendant materially breached the Plaintiff Policies in several respects, including but not limited to the following:

a.     By increasing the Monthly Deduction Rates on a basis other than changes to Defendant's expectations as to future cost factors;

b.     By increasing the Monthly Deduction Rates in an attempt to circumvent the guaranteed minimum interest rate;

c.     By increasing the Monthly Deduction Rates in an attempt to recover past losses or make up for prior shortfalls in expected revenue; and

d.     By imposing excessive Monthly Deduction Rates, including by failing to lower Monthly Deduction Rates.

79.     Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

80.     As a direct and proximate cause of Defendant's material breaches of the Plaintiff Policies, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

**<u>COUNT II</u>**

**(Implied Covenant of Good Faith and Fair Dealing – Contractual Breach)**

**(Policies issued in AZ, CA, FL, GA, MN, NE, and PA)**

81.     Plaintiffs reallege the allegations contained in paragraphs 1 through 80, inclusive, as if set forth fully herein.

82.     The Plaintiff Policies are binding and enforceable contracts.

- 29 -

83.    The Plaintiff Policies include an implied covenant, actionable in contract, that Defendant will act in good faith and deal fairly with Plaintiffs.

84.    Defendant materially breached the Plaintiff Policies in several respects, including but not limited to the following:

a.    By charging excessive Monthly Deduction Rates, thereby denying Plaintiffs the benefit of their actual policy Accumulation Values;

b.    By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising the Monthly Deduction Rates;

c.    By increasing the Monthly Deduction Rates in an attempt to achieve Transamerica's original expected profitability for the Policies at policyholders' expense;

d.    By improperly targeting its rate increases at policyholders, including Plaintiffs, who have chosen to exercise their right to fund their policies as they choose;

e.    By increasing the Monthly Deduction Rates to circumvent the guaranteed minimum interest rate under the Plaintiff Policies;

f.    By attempting to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid to date;

g.    By failing to lower Monthly Deduction Rates; and

h.    By failing to provide meaningful disclosures about the increase in Monthly Deduction Rates.

85.    Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

86.     Defendant's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the benefits of the Plaintiff Policies.

87.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.

## COUNT III

### (Implied Covenant of Good Faith and Fair Dealing – Tortious Breach)

### (Policies issued in CA)

88.     Plaintiffs reallege the allegations contained in paragraphs 1 through 87, inclusive, as if set forth fully herein.

89.     The Plaintiff Policies are binding and enforceable contracts.

90.     The Plaintiff Policies, like all contracts of insurance in California, include an implied covenant that Defendant will act in good faith and deal fairly with Plaintiffs.  As a result, Transamerica must refrain from doing anything to injure Plaintiffs' right to receive the benefits of the Policies.  Transamerica is required to give at least as much consideration to the welfare of the policyholders as it gives to its own interests.  Furthermore, Transamerica has a duty to reasonably inform Plaintiffs of their rights and obligations under the Policies.

91.     Defendant materially breached the Plaintiff Policies in several respects, including but not limited to the following:

a.     By charging excessive Monthly Deduction Rates, thereby denying Plaintiffs the benefit of their actual policy Accumulation Values;

b.     By considering interest that it earns on policyholder accounts, as opposed to interest only from its mortality profits, in raising the Monthly Deduction Rates;

c.    By increasing the Monthly Deduction Rates in an attempt to achieve Transamerica's original expected profitability for the Policies at policyholders' expense;

d.    By increasing the Monthly Deduction Rates to circumvent the guaranteed minimum interest rate under the Plaintiff Policies;

e.    By attempting to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid to date; and

f.    By failing to provide meaningful disclosures about the increase in Monthly Deduction Rates.

92.    Plaintiffs have performed all of their obligations under the Plaintiff Policies, except to the extent that their obligations have been excused by Defendant's conduct as alleged herein.

93.    Defendant's breaches were conscious, deliberate, and unreasonable acts, which were designed to and which did unfairly frustrate the agreed common purposes of the Plaintiff Policies and which disappointed Plaintiffs' reasonable expectations by denying Plaintiffs the insurance benefits of the Plaintiff Policies, including the Accumulation Value, due to Plaintiffs under the Plaintiff Policies.

94.    Transamerica's Monthly Deduction Rate increases deny Plaintiffs the benefit of their policies by, among other things, causing the early termination of Plaintiffs' policies.  By increasing the Monthly Deduction Rate and thereby shortening the period of coverage, Transamerica has denied policyholders, including Plaintiffs, the full coverage they were entitled to based on proper Monthly Deduction Rates.  Moreover, the benefit of a life insurance policy is commensurate with its cost.  No one would buy life insurance if the cost was greater than the benefit.  By unlawfully increasing the Monthly Deduction Rates, Transamerica intended to make the cost of the policies greater than the benefit so that

policyholders like Plaintiffs would let their policies lapse, and Transamerica would never have to pay the death benefit.  There is simply no difference between denying a policyholder the death benefit and causing a policy to terminate earlier so that Transamerica will never have to pay the death benefit, especially when an insurance company does so in bad faith.  Transamerica's conduct has forced Plaintiffs, among other policyholders, to sue Transamerica to enforce the terms of the Policies in order to avoid such lapses.

95.    Significantly, Plaintiffs' Policies are unique contracts of insurance that insure the lives of specific individuals; they are not replaceable on the open market. In response to Transamerica's bad faith conduct, Plaintiffs cannot obtain another policy on the same life and under the same terms.

96.    Furthermore, Transamerica's bad faith attempt to force Plaintiffs and other policyholders either to (a) pay exorbitant premiums that Transamerica knows would no longer justify the ultimate death benefits (and, therefore, reduce the value of the ultimate death benefits) or (b) lapse or surrender their Policies, thereby forfeiting the premiums they have paid to date, harms consumers, particularly older aged insureds, because it will have a chilling effect on the secondary market for life insurance and deprive elderly insureds of the option to sell their policies rather than lapse or surrender them.  With a healthy secondary market, older aged insureds who can no longer obtain alternative life insurance due to insurers' rate increases can at least obtain financial security by selling their policies for a fair market value.  That return will greatly diminish if Transamerica can raise rates unlawfully with impunity and investors will not be afforded the same remedies and protections as other policyholders.

97.    Plaintiffs do not have adequate means to address Transamerica's willful and wanton conduct except through a claim of tortious breach.  The rights and remedies available through this cause of action, such as attorneys' fees, are not necessarily available for all other causes of action asserted herein.  Only through

this cause of action, in addition to the others asserted herein, can Plaintiffs be made whole.  Only through this cause of action, in addition to the others asserted herein, can this Court adequately deter Transamerica from brazenly disregarding policyholders' contractual rights in the future.

98.    As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, Transamerica's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## COUNT IV

### (Conversion)

### (All Policies)

99.    Plaintiffs reallege the allegations contained in paragraphs 1 through 98, inclusive, as if set forth fully herein.

100.    Plaintiffs had a property interest in the funds Defendant deducted from their Accumulation Values in excess of the amounts permitted by the terms of the Policies due to Defendant's wrongful increases in Monthly Deduction Rates.

101.    Plaintiffs had the right to immediately possess the funds from their Accumulation Values through a variety of contractual measures, including Surrender Penalty Free Withdrawals.  The specific amount capable of immediate withdrawal is determinable by a specific calculation included in each policy contract.

102.    Defendant intentionally and substantially interfered with that property interest.  By increasing Monthly Deduction Rates and making Monthly Deductions in unauthorized amounts from the Accumulation Values of Plaintiffs' Policies, Defendant assumed and exercised ownership over, and misappropriated or

misapplied, specific funds placed in the custody of Defendant for the benefit of Plaintiffs, without authorization or consent and in hostility to the rights of Plaintiffs.

103.   Defendant continues to retain these funds unlawfully.  At no time did Plaintiffs consent to such wrongful deduction and retention of funds by Defendant.

104.   Defendant's wrongful exercise of control over the personal property of Plaintiffs constitutes conversion.

105.   Defendant intended to cause damage to the Plaintiffs by increasing Monthly Deduction Rates and deducting more from Plaintiffs' Policies' Accumulation Values than was authorized by the Policies.

106.   As a direct and proximate result of Defendant's conduct, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial, but in any event that exceeds $75,000, exclusive of interest.  Furthermore, Transamerica's conduct was conscious and deliberate, and constitutes oppression, fraud, or malice, justifying an award of punitive damages.

## **COUNT V**

### **(Declaratory Relief)**

### **(All Policies)**

107.   Plaintiffs reallege the allegations contained in paragraphs 1 through 106, inclusive, as if set forth fully herein.

108.   For reasons including, but not limited to, those stated herein, there exists an actual dispute and controversy between Plaintiffs and Defendant concerning Plaintiffs' rights and Defendant's obligations under the Plaintiff Policies, including but not limited to how Defendant must implement any change in the Monthly Deduction Rates and under what circumstances Defendant may change the Monthly Deduction Rates.

109.   Accordingly, Plaintiffs seek a declaration (a) that Defendant's increase in the Monthly Deduction Rates is improper under the Plaintiff Policies and that any excess premiums received must be returned or the Policies' account values

1    recalculated according to the original Monthly Deduction Rates; and (b) setting

2    forth the specific guidelines that govern the factual circumstances under which

3    Defendant can raise the Monthly Deduction Rates.

4      110. Such a declaration will help prevent or limit any future controversies

5    under the Plaintiff Policies by providing guidance as to when and how Defendant

6    can change the Monthly Deduction Rates on its in-force Transamerica Policies.

7    **<u>PRAYER FOR RELIEF</u>**

8      WHEREFORE, Plaintiffs pray for relief and judgment as follows:

9    **<u>On the First Count</u>**

10      1. For compensatory damages in an amount to be determined at trial;

11      2. For an award of pre-judgment and post-judgment interest;

12      3. For the costs of the suit herein incurred, including reasonable

13    attorneys' fees to the extent permitted by law; and

14      4. For such other and further relief as the Court may deem proper.

15    **<u>On the Second Count</u>**

16      1. For compensatory damages in an amount to be determined at trial;

17      2. For an award of pre-judgment and post-judgment interest;

18      3. For the costs of the suit herein incurred, including reasonable

19    attorneys' fees to the extent permitted by law; and

20      4. For such other and further relief as the Court may deem proper.

21    **<u>On the Third Count</u>**

22      1. For compensatory damages in an amount to be determined at trial;

23      2. For punitive damages in an amount to be determined at trial;

24      3. For an award of pre-judgment and post-judgment interest;

25      4. For the costs of the suit herein incurred, including reasonable

26    attorneys' fees to the extent permitted by law; and

27      5. For such other and further relief as the Court may deem proper.

28

FIRST AMENDED COMPLAINT
CASE NO. 2:20-cv-02516-CAS(GJSx)

**On the Fourth Count**

1.     For compensatory damages in an amount to be determined at trial;

2.     For punitive damages in an amount to be determined at trial;

3.     For an award of pre-judgment and post-judgment interest;

4.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

5.     For such other and further relief as the Court may deem proper.

**On the Fifth Count**

1.     For a declaration (a) that Defendant's increase in the Monthly Deduction Rates is improper under the Plaintiff Policies and that any excess premiums received must be returned or the Policies' account values recalculated according to the original Monthly Deduction Rates; and (b) setting forth the specific guidelines that govern the factual circumstances under which Defendant can raise the Monthly Deduction Rates;

2.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

3.     For such other and further relief as the Court may deem proper.


Dated:     August 12, 2020          ORRICK, HERRINGTON & SUTCLIFFE LLP


By:          */s/ Khai LeQuang*
                 KHAI LEQUANG
                 AARON M. RUBIN
                 RICHARD W. KREBS

Attorneys for Plaintiffs
CREDIT SUISSE LENDING TRUST (USA), CREDIT SUISSE LENDING TRUST (USA) 5, and PRIMARY MASTERBAREAF PTC LIMITED, on behalf of and as trustee of the CSSEL GUERNSEY BARE TRUST

FIRST AMENDED COMPLAINT
CASE NO. 2:20-CV-02516-CAS(GJSx)

- 37 -

1

2
## **DEMAND FOR JURY TRIAL**

3
      Plaintiffs hereby demand trial by jury pursuant to Rule 38(b) of the Federal

4
Rules of Civil Procedure.

5
Dated:      August 12, 2020      ORRICK, HERRINGTON &

6
      SUTCLIFFE LLP

7

8
By:      */s/ Khai LeQuang*

9
      KHAI LEQUANG

10
      AARON M. RUBIN
RICHARD W. KREBS

11

12
Attorneys for Plaintiffs

13
CREDIT SUISSE LENDING TRUST
(USA), CREDIT SUISSE LENDING

14
TRUST (USA) 5, and PRIMARY
MASTERBAREAF PTC LIMITED, on

15
behalf of and as trustee of the CSSEL
GUERNSEY BARE TRUST

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint
Case No. 2:20-cv-02516-CAS(GJSx)